# UNITED STATES DISTRICT COURT

<u>NORTHERN</u>    DISTRICT OF    <u>ILLINOIS, EASTERN DIVISION</u>

UNITED STATES OF AMERICA

v.

ARTUR FLASZ and
ADAM BOJDA

**MAGISTRATE JUDGE KEYS**

**FILED**

OCT 2 5 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

CASE NUMBER:

**07CR    694**

I, the undersigned complainant, being duly sworn, hereby state that the following is true and correct to the best of my knowledge and belief:  Beginning no later than in or about June 2006, and continuing to the present, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendants ARTUR FLASZ and ADAM BOJDA:

> devised and participated in a scheme to defraud and to obtain money and funds owned by and under the custody and control of various FDIC-insured financial institutions, including BMW Bank of North America, Delaware Place Bank, Eaglemark Savings Bank, Fifth Third Bank, and JP Morgan Chase Bank, among others, by means of materially false and fraudulent pretenses, representations, and promises, and knowingly executed and attempted to execute this scheme on or about October 21, 2006 by causing false statements to be made in a consumer credit application for the purchase of a 2006 BMW 750Li from a BMW dealership in Chicago, Illinois, which purchase was financed by BMW Bank of North America,

in violation of Title 18, United States Code, Section 1344.  I further state that I am a Special Agent of the U.S. Secret Service, and that this complaint is based on the following facts:

(see attached affidavit)

Continued on the attached sheet and made a part hereof:  __X__ Yes    ____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

<u>October 25, 2007</u>
Date

at <u>Chicago, Illinois</u>
City and State

<u>Arlander Keys, U.S. Magistrate Judge</u>
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT

I, THOMAS TILTON, being duly sworn, hereby state as follows:

### I. Introduction

1.     I am a Special Agent of the U.S. Secret Service and have been so employed since 1985. I am currently assigned to the Chicago Field Office. My responsibilities include investigating financial crimes, deceptive practices, and related offenses, including misuse of identification documents.

2.     This affidavit is submitted in support of a criminal complaint charging ARTUR FLASZ and ADAM BOJDA with bank fraud, in violation of Title 18, United States Code, Section 1344. As described in more detail below, there is probable cause to believe that FLASZ and BOJDA organized and participated in a scheme to obtain expensive cars and property by fraudulent means.

3.     The investigation of FLASZ, BOJDA, and their associates is being conducted jointly by the Secret Service, the Illinois State Police's Kane/Cook Auto Theft Task Force ("KCAT"), and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). I have knowledge of the facts set forth in this affidavit as a result of my participation in the investigation. I also have discussed the facts of this investigation, as summarized herein, with other law enforcement agents who have participated in the investigation, and I have reviewed reports prepared by them. The facts set forth in this affidavit are also based on information provided by a cooperating witness ("CW") and a confidential informant ("CI"). Finally, I have personally reviewed records obtained from banks and other financial institutions which were induced to finance the purchase of vehicles and property as a result of false statements made on loan and

credit applications.

4.      Since this affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint, this affidavit does not contain all of the facts known by me with regard to the investigation and the individuals and events described herein. All witness interviews and conversations referenced in this affidavit are described in summary, non-verbatim form; such summaries do not constitute, and do not purport to be, detailed recitations of all statements made by all of the participants in the interviews and/or conversations. Some of the conversations referenced in this affidavit were recorded in the Polish language and have been translated by Polish-speaking Secret Service agents. All such translations are preliminary and non-verbatim. References to other conversations in the Polish language which were not recorded or have not been translated at this time are based on non-verbatim summaries of the conversations provided by one of the participants to the conversations, either the CW or the CI, who speak Polish. Finally, all dates referenced herein are approximate.

## II. Overview of the Case

### A.    *The Scheme*

5.      Since at least June 2006, FLASZ and BOJDA have been acquiring vehicles and property in other people's names and on their credit. FLASZ and BOJDA recruited individuals ("straw buyers") to sign all of the paperwork, including vehicle and home loan applications. The loan applications appear to have falsified the straw buyers' income and employment information so that they would appear to be qualified

2

for vehicle and home loans. Lenders were induced to finance the home and vehicle purchases based on these false loan applications. FLASZ and BOJDA then took control of the vehicles and property for their own benefit and use.

6. One of the straw buyers who was recruited by FLASZ and BOJDA (the CW) contacted the government after they had threatened to harm him and his family if he did not follow their instructions. The government opened an investigation and the CW agreed to provide assistance during the investigation. In addition to providing information, the CW agreed to record conversations with FLASZ and BOJDA. A government informant (the CI) also recorded conversations with FLASZ and BOJDA during the investigation. The CI portrayed himself to FLASZ and BOJDA as an exporter who would be willing to ship vehicles out of the country for them. In reality, the CI was cooperating with the government and turned over to the government any vehicles that he obtained from FLASZ and BOJDA. So far, the CI has managed to stall FLASZ and BOJDA by telling them, among other things, that he will not ship vehicles overseas until he receives titles for the vehicles.

7. Evidence obtained during the investigation led to the issuance of a search warrant by a state court judge on May 2, 2007, authorizing a search of the premises of FLASZ's residence. The search warrant resulted in the seizure of six vehicles, among other things. FLASZ himself was arrested later that same day at O'Hare Airport, where he was waiting with his girlfriend for a flight to Poland. FLASZ has been charged in state court with two counts of aggravated possession of a stolen vehicle and two counts of theft by deception. That case is pending.

### B.    Defendants and Cooperating Individuals

### Artur Flasz

8.    According to the records of Immigration and Customs Enforcement ("ICE"), FLASZ is a Polish-born, naturalized citizen of the United States.

9.    FLASZ has been released on bond in connection with his pending state court case and appears to be making plans to return to Poland or to relocate elsewhere. In August 2007, FLASZ delivered to the CI a truck containing furniture and personal belongings for shipment to Poland.

### Adam Bojda

10.    ICE records reflect that BOJDA is a Polish-born, lawful permanent resident of the United States.  His place of residence and employment, if any, are unknown.

### The Cooperating Witness (CW)

11.    The CW is a 70-year-old, retired janitor.  He was born in Poland and is a U.S. citizen.  The CW has no known criminal convictions on his record.  However, criminal charges are currently pending against the CW in the Circuit Court of Cook County, specifically, charges of forgery and residential burglary, in connection with the alleged theft and forgery of a check from his daughter.

### The Confidential Informant (CI)

12.    The CI is a paid government informant who is engaged in the business of arranging international shipments of goods for members of the Polish community on the Northwest side of Chicago.  The CI has been paid for providing information and

4

assistance in connection with various investigations involving criminal activity of which he has become aware through his business and contacts in the Polish community.

### III.  History of the Investigation

13.    The investigation commenced in about December 2006, when the CW came forward and provided information about the scheme.  The CW agreed to cooperate with the government on an ongoing basis and in fact continued to provide information during the course of the investigation.  Below is a summary of some of the information provided by the CW during his initial debriefing and in subsequent meetings and interviews during the investigation.

### A.    *Debriefings of the CW*

14.    The CW was initially debriefed by Secret Service Special Agents on December 21, 2006, and later by KCAT Inspectors on May 3, 2007.  The following is a summary of some of the information provided by the CW during those debriefings:

(a)    The CW met FLASZ and BOJDA after responding to an advertisement in a Polish-language newspaper known as <u>Dziennik Zwiazkowy</u>.  The advertisement solicited individuals who were leaving the country and wanted to make money.  The CW provided a copy of the newspaper ad.[1]  The CW said that he called the telephone number listed in the ad and spoke to BOJDA.  He subsequently met with

---

[1] The ad has been translated by a Polish-speaking Secret Service agent as stating: "Attention! Attention! Leaving the U.S. permanently?  Do you want to make good money?  Call 773/727-7090."

BOJDA, whose voice he recognized as the caller he spoke with on the phone. They met at the parking lot of a Menard's store located at 900 Irving Park Road, Hanover Park, Illinois. During this meeting, BOJDA explained that he was involved in the business of buying homes, rehabbing them, and reselling them at a profit. BOJDA explained that he needed people with good credit to finance the purchase of the homes and that the CW would make approximately $30,000 upon the sale of a home. BOJDA told the CW that he wanted to buy a house located at 1801 Elm Street, Park Ridge, Illinois ("the Elm Street property"). The CW agreed to participate in this real estate transaction and provided BOJDA with his personal identifying information, including his social security number.

(b)    After his meeting with BOJDA, the CW did a computer search for information about the Elm Street property and he discovered that it was listed for sale for about $670,000. The CW then called a friend who was a realtor and, after explaining the deal proposed by BOJDA, was told that he should get out of the deal. The CW's friend told the CW that the home previously had been listed at approximately $500,000, then raised to $600,000, then to $670,000, and finally to $680,000. Shortly after the CW discussed this deal with his friend, BOJDA appeared at the CW's home with another individual called "Gorilla." The CW told BOJDA that he would not go through with the home purchase. BOJDA responded that the deal was set and that the CW would have to pay $20,000 to BOJDA for the inconvenience of canceling the deal. The CW refused to pay. BOJDA advised the CW that he (the CW) was "dead" and they (BOJDA and others) would "make problems" for his family. The

6

CW became afraid and agreed to go through with the home purchase. The CW subsequently attended a real estate closing and signed two loan applications for two separate loans funding 100% of the purchase price of the property. According to the CW, the mortgage applications that he signed at the closing were already completed when he arrived and included false employment and income information. The CW was listed as the owner of a construction company earning a substantial income, when in fact he was unemployed and had no income. At the conclusion of the closing, BOJDA gave the CW $10,000 in cash. BOJDA told the CW that he would receive the remainder of the promised $30,000 after they (BOJDA and his associates) rehabbed and resold the house. (This closing took place on about June 15, 2006.)

(c)     On or about October 20, 2006, BOJDA called the CW and told him to go to a gas station where FLASZ would be waiting for him. The CW went to the gas station, as instructed, and met with FLASZ, who was driving a red Mercedes roadster. FLASZ instructed the CW to follow him, which the CW did, eventually arriving at an auto dealership near O'Hare Airport, known as Luxury Motors O'Hare. According to the CW, FLASZ told him that he (the CW) was going to buy a couple of cars. The CW initially refused. FLASZ told the CW not to make any trouble. At FLASZ's direction, the CW then signed paperwork for the purchase of two vehicles, specifically, a black 2007 Mercedes S550 and a gray Lexus 470 sport utility vehicle ("SUV"). While at the dealership, FLASZ also directed the CW to remove the license plates from his own vehicle, a Mercury Villager minivan, so that they could be transferred to the red Mercedes roadster that FLASZ had driven to the dealership. BOJDA subsequently

7

joined the CW and FLASZ at the dealership.

      (d)    The CW believed that he subsequently met with FLASZ in or about November 2006 at Barbakan restaurant, 3145 North Central, Chicago, Illinois. FLASZ was with a woman named K.B.[2] FLASZ drove the CW and K.B. to a BMW dealership in Chicago, Perillo BMW, so that they could buy more cars. FLASZ instructed the CW to buy a used 2006 BMW 7-series automobile. FLASZ instructed K.B. to buy a BMW 3-series automobile. FLASZ further instructed the CW and K.B. not to say anything during the transactions and that he would take care of everything. The CW and K.B. accompanied FLASZ to meet with a salesman and a finance person. The CW met with the sales and finance personnel first, followed by K.B. FLASZ did all of the talking during the CW's meetings with the dealership personnel. After the meetings, FLASZ told the CW not to wait for K.B., but to drive the newly-purchased BMW to a certain restaurant and meet with BOJDA. The CW complied. At the restaurant, BOJDA explained to the CW that they (BOJDA and FLASZ) would make all of the car payments, that they were building up the CW's credit, and that the next house that they were going to buy with the CW's identity was worth about $4 million.

      15.    The CW provided agents with various documents that he received in connection with the transactions described above. Among the documents provided by the CW was an insurance bill that he had received in the mail, which listed the vehicles that he had purchased at the direction of FLASZ and BOJDA, specifically, a

---

[2] Initials are used in this affidavit in lieu of the full names of individuals who are not named as defendants or who are witnesses.

2007 Mercedes, a 2006 BMW, and a 2003 Lexus (referenced in paragraphs 14(c) and 14(d) above). With regard to the property purchased by the CW, specifically, the Elm Street property (referenced in paragraphs 14(a) and 14(b) above), the CW provided Agent Lane with a warranty deed reflecting his purchase of the property.

**B.    *Assistance Provided by the CW***

16.    During the course of the investigation, the CW notified law enforcement agents when he had contact with FLASZ and BOJDA, and he recorded some of his conversations with them. Below is a summary of some of those activities.

**February 2007**

17.    On February 5, 2007, the CW reported that FLASZ and BOJDA were angry with him for incurring charges on his credit cards. According to the CW, FLASZ and BOJDA were angry because they had to pay off the CW's credit card debts to get the CW's credit score to an acceptable level to qualify for another home loan. The CW further stated that FLASZ and BOJDA gave him $6,770 in cash to deposit into his bank account to cover a mortgage payment and a car payment. The CW said that FLASZ wanted to meet him later that day to make the mortgage payment via Western Union. The CW and FLASZ agreed to meet at a Harris Bank branch in Chicago.

18.    Secret Service agents established surveillance at the Harris Bank branch and provided the CW with a recording device so that he could record his conversation with FLASZ.

19.    The surveillance agents observed FLASZ arrive at Harris Bank driving the 2007 Mercedes S550 that the CW had previously purchased at FLASZ's direction

9

(see paragraph 14(c) above).  After FLASZ arrived, the CW entered the Mercedes, conversed briefly with FLASZ, and then accompanied FLASZ across the street to a Western Union office.  FLASZ subsequently departed in the Mercedes.

20.    Upon FLASZ's departure, an agent retrieved the recording device from the CW.  The recorded conversation, which was in Polish, has been translated.  The preliminary translation reflects that FLASZ told the CW that he was expecting to receive two cars the following week.  FLASZ instructed the CW to report the red car stolen (believed to be referring to the red Mercedes roadster on which the CW's license plates had been placed at Luxury Motors (*see* paragraph 14(c) above)).  FLASZ further instructed the CW not to report the red car stolen until it was "taken apart to pieces." During this conversation, FLASZ also gave the CW instructions regarding how to make a payment for "Franklin Loan Service" (referring to the lender for the Elm Street property (*see* paragraph 14(b) above)).  FLASZ told the CW that his (the CW's) credit cards were causing problems and needed to be fixed.  FLASZ told the CW that "we" were going to remove the cars from the CW's credit.  When the CW questioned FLASZ about why he (FLASZ) had five cars in front of his house, FLASZ responded that he was sending them to Poland.  FLASZ mentioned at one point during the conversation that he was going back to Poland in three months.  The CW and FLASZ also discussed a "$4 million" house that FLASZ was having built.  FLASZ told the CW that he (the CW) needed to raise his credit score by 100 points and he would be "back in the game" and could buy a house.

21.    The CW was debriefed following this meeting with FLASZ.  The CW

confirmed that they made a Western Union wire transfer to pay for the mortgages on

the Elm Street property. During this debriefing, the CW also provided information

about past dealings with FLASZ. Specifically, the CW stated that payment books for

the auto loans had come to his house and that FLASZ would drop off cash to be used

by the CW to make loan payments. Each month, FLASZ would bring approximately

$11,000 to the CW to make auto and home loan payments. FLASZ instructed the CW

that, in the event that FLASZ was late in delivering money to the CW to make a

payment, the CW was supposed to make the payment himself, with his own money,

and that FLASZ would pay him back later.

**March 2007**

22.    On March 5, 2007, the CW reported that earlier in the day, FLASZ and

BOJDA came to his house unannounced,[3] carrying a report of the CW's credit history.

They had obtained the credit report, without the CW's knowledge or consent, from

Luxury Motors O'Hare, where FLASZ had previously taken the CW to buy cars (*see*

paragraph 14(c) above). The CW further stated that BOJDA and FLASZ were upset

with him because his credit score was too low because of missed loan payments.

FLASZ and BOJDA threatened the CW and demanded that he repay the money that

they had previously given to him to make payments on the car and home loans, as well

as the $10,000 that he was paid for purchasing the Elm Street property (*see* paragraph

---

[3] At this time, the CW was staying in the Elm Street property because his wife had
thrown him out of their home after learning that he had allowed his identity to be used and
had participated in the property and vehicle transactions.

14(b) above). They wanted a total of $50,000. During this meeting, FLASZ also told the CW that he and BOJDA had used another individual named M.G. to make purchases totaling about $4 million.[4]

23.    The next day, March 6, 2007, the CW reported that FLASZ was on his way to see the CW. A Secret Service agent immediately drove to the Elm Street property and observed FLASZ arrive in a 2007 Mercedes Benz, bearing a license plate registered to M.G. Subsequent to this meeting, the CW was debriefed. The CW stated that FLASZ had come to obtain personal checks from the CW to make a payment on the home in which FLASZ was residing in Niles, Illinois. FLASZ told the CW that he was renting the home from a woman who had used false identification documents to purchase the home. FLASZ also brought up the subject of a Mercedes Benz SUV that he and BOJDA had given the CW to drive. FLASZ told the CW that BOJDA had made a deal to possibly sell the vehicle in Wisconsin. The agent observed the Mercedes Benz SUV parked in the garage and noted the license plate (IL 9317603) which was registered in the name of an unknown person.

24.    On March 7, 2007, the CW reported that FLASZ and BOJDA had come and taken the Mercedes Benz SUV from the Elm Street property. The CW was not told where they were taking the car. The CW stated that FLASZ told him that the next

---

[4] M.G. is believed to be a citizen of Czech Republic. A search of a Customs database indicated that an individual named M.G. left the United States in December 2006. Law enforcement agents in the Czech Republic have located a person there whom they believe to be M.G., but that individual has not been formally interviewed yet. A review of an Illinois Secretary of State vehicle registration database has revealed that approximately 8 different vehicles were purchased by M.G., or someone using M.G.'s name, during January and February 2007.

12

day, FLASZ would provide the CW with money to pay his debts.

25.    The next day, March 8, 2007, an agent conducted surveillance at the Elm Street property and observed FLASZ come and go. After FLASZ left, the CW stated that FLASZ had given him $10,740 in cash to make loan payments.

**April 2007**

26.    On April 24, 2007, the CW reported that an individual had come to the Elm Street property seeking to repossess a vehicle that the CW did not know anything about. An agent then interviewed the repossessor, who confirmed that he was seeking to repossess an Audi Q7 that had been purchased from an Audi dealership in Westmont, Illinois. The purchaser of the vehicle was an individual named W.J. The repossessor went looking for the vehicle at the Elm Street property because that was the address listed on the auto loan application for W.J.'s place of employment.

27.    On April 25, 2007, the CW called FLASZ to ask him about this vehicle. The CW placed the call under the supervision of an agent and recorded his conversation with FLASZ. During this conversation, which has been translated, the CW asked FLASZ why a man had come to the Elm Street property the day before to repossess a car in the name of W.J. The CW told FLASZ that, according to the man who came to the house, the house was listed as W.J.'s place of employment, no other contact information could be corroborated, and no one was making payments on the auto loan. FLASZ responded that everything would be okay and that he would explain everything at a later time.

28.    On that same day, an agent received a call from a deputy of the Cook

13

County Sheriff's Department, who stated that he had gone to the Elm Street property to retrieve a stolen vehicle that was located in the garage. The vehicle was a 2004 BMW M3 coupe registered to M.G., which had been purchased from Luxury Motors O'Hare. The Sheriff's deputy indicated that the lender, Delaware Place Bank, reported the vehicle stolen and activated the vehicle's GPS system, which enabled him to trace the vehicle to the Elm Street property.

29.    The agent then met with the CW to place another recorded telephone call to FLASZ. The telephone conversation was not successfully recorded, however, because of an equipment malfunction. Following the conversation, which was in Polish, the CW informed the agent as to what was said. According to the CW, he advised FLASZ that the police had come and taken the vehicle. FLASZ told the CW not to worry about getting in trouble because the problem was his fault and he did not make the payments on the vehicle. FLASZ stated that he would attempt to make the necessary payments to the bank to get the vehicle back. FLASZ then said that he would come to the Elm Street property to pick up some insurance paperwork.

30.    The agent conducted surveillance and subsequently observed FLASZ arrive and depart from the Elm Street property. The CW advised the agent that FLASZ was calm and did not seem worried about losing the vehicle. The CW said that FLASZ took responsibility, but was upset with another person for not being more responsible with the car, including putting new license plates on the car. FLASZ stated that he (FLASZ) should have disconnected the GPS system in the vehicle and would try to be more careful in the future.

14

31.    On April 27, 2007, the CW advised that, earlier in the day, he had a meeting with FLASZ and BOJDA at Lubyana bar in Chicago. The CW stated that FLASZ said that he was bringing an attorney to Chicago from New Jersey to try to fix the CW's credit score. FLASZ said that if this did not work, their partnership would be over and that the CW would have to fly home to Poland and not return to the United States. FLASZ further told the CW that all of the vehicles that were in the CW's name would be shipped to Poland soon and that if the CW stayed in the United States he would face legal trouble. Another subject that was discussed during this meeting was the sale of a house located on Forrest Preserve Boulevard in Chicago. FLASZ told the CW that the seller of the house had called him and told him that the police were at his house to discuss his sale of the house to M.G.[5] FLASZ advised the CW that if he was ever questioned by the police, to tell them that the CW signed the closing papers for a friend, M.G., who was out of town for the closing. FLASZ also advised the CW to tell the police that the CW was collecting rent for his friend, M.G., from the current residents of the house. FLASZ and BOJDA informed the CW that M.G. had built up several million dollars in debt, and that they would soon stop paying bills in his name.

32.    On April 30, 2007, the CW reported that FLASZ had contacted him and told him that "they" (FLASZ and BOJDA) were not going to be making any more payments on the car and home loans in the CW's name, and that the CW and FLASZ each had to drive a car to Canada and sell the car. FLASZ said that they would be

---

[5] Secret Service agents had in fact gone to the seller's residence that day and interviewed him about the sale of the Forrest Preserve property to M.G.

15

going to a city in Ontario just across the border. The CW further stated that FLASZ was planning to ship motorcycles and 4-wheel off-road vehicles to Poland within days.

## C.    *Search Warrants and the Arrest of FLASZ*

33.    In May 2007, state and federal law enforcement officers executed search warrants at FLASZ's residence (7928 North Oconto Avenue, Niles, Illinois) and at the residence of FLASZ's girlfriend (1899 Weeg Way, Park Ridge, Illinois) — locations where, at various points during the investigation, agents observed some of the fraudulently-obtained vehicles. Several vehicles were seized during the searches of those two residences. Following the searches, FLASZ tried to arrange the shipment of other vehicles out of the country. Unbeknownst to FLASZ, the individual with whom he met to arrange the shipment of the vehicles (the CI), was cooperating with the government. FLASZ was then arrested at O'Hare Airport before he could leave the country. All of these activities, summarized below, took place on May 2, 2007.

### The Search of FLASZ's Residence

34.    During the execution of the search warrant at FLASZ's residence, three motorcycles were found in the garage. Only one of the three motorcycles was titled in FLASZ's name. The other two motorcycles bore license plates registered to another individual (M.G.). Parked in the driveway was a car with a license plate registered in the name of M.G., specifically, a 2005 Porsche Cayenne. Two additional cars, a Lexus GX470 and a Mercedes S550 were parked in the driveway. The Lexus and Mercedes appeared to be the same vehicles that had been purchased by the CW at FLASZ's direction during 2006 (*see* paragraphs 14(c) and 14(d) above); the license plates on

16

those vehicles were registered in the CW's name. Inside the residence, agents located and seized, among other things, credit cards in M.G.'s name and various documents containing identity information of other individuals.

35.    FLASZ, who was present when the law enforcement agents arrived to execute the search warrant, consented to an interview. During the interview, FLASZ stated that he had moved into the property six months ago and was renting it from the owner. FLASZ further stated that the owner had "disappeared" and that he was paying the mortgage until his attorney figured out what was going to happen to the house. When asked about the two motorcycles that were in M.G.'s name, FLASZ stated that M.G. had gone to Europe several months ago and that he (FLASZ) was holding the motorcycles for M.G. until he returned. With regard to the Porsche Cayenne that was in M.G.'s name, FLASZ stated that it had been dropped off at his house by a friend. FLASZ added that he did not drive the vehicle. FLASZ further stated that the other cars, namely, the Mercedes and the Lexus, had been loaned to him by the CW and that he (FLASZ) was making the car payments.

### The Search of the Residence of FLASZ's Girlfriend

36.    While law enforcement officers were executing the search warrant at FLASZ's residence, other officers executed a search warrant at the residence of FLASZ's girlfriend. During this search, officers located and seized identification documents that were in the names of different females. Officers also seized a 2004 Mercedes E500, registered to an "Aneta Pusak."

37.    FLASZ's girlfriend (A.B.), who was present when the officers arrived to

17

execute the search warrant, consented to an interview.  During the interview, A.B. admitted that she had been living illegally in the United States under a false identity, "Aneta Pusak." A.B. further admitted that she used the "Pusak" name to purchase the Mercedes and the home, all with the assistance of FLASZ.  A.B. stated that FLASZ took her to Luxury Motors several times to purchase cars.  She acknowledged that she made only about $700-$900 per week working at a bar in Chicago.  Among the other statements made by A.B. was that during the prior week she was driving an Audi Q7 owned by someone named "Milan" (believed to be referring to M.G.), but that FLASZ took the car back.

### The Arrest of FLASZ

38.    Later in the day, after the search warrants had been executed and after FLASZ and his girlfriend had been interviewed, FLASZ met with the CI at Paterno's bar, located on Milwaukee and Central Avenue in Chicago.  Also attending that meeting were BOJDA and an associate of FLASZ and BOJDA, known only as "Wojtek." This meeting, which was not recorded, was witnessed by law enforcement officers who were conducting surveillance.

39.    After the meeting, the CI was debriefed.  According to the CI, FLASZ indicated that he was in a hurry to leave the country and that he needed to ship three cars and six motorcycles to Poland as soon as possible.  FLASZ told the CI that his wife would call the CI the next day to provide the location of the vehicles.

40.    At another point on this same day, the CW contacted an agent and informed him that FLASZ had called him and said that he was on his way out of the

18

country and that the CW must leave the country as well. The agent then contacted Immigration and Customs Enforcement ("ICE") to try to verify whether FLASZ had made arrangements to leave the country. An ICE agent reported that FLASZ and his girlfriend (A.B.) had purchased plane tickets that day, in cash, for a flight departing for Warsaw, Poland, that night.

41.     Law enforcement officers went to O'Hare Airport to arrest FLASZ before he could leave the country. FLASZ and A.B. were located and taken into custody at the airport. They were subsequently released on bond.

**D.     Activities Occurring Subsequent to FLASZ's Arrest**

42.     Despite his arrest, FLASZ continued his participation in the scheme, together with BOJDA and others.

43.     On May 4, 2007, the CI reported that he had been contacted by BOJDA to set up a meeting to discuss the shipping of several cars and motorcycles to Poland. BOJDA instructed the CI to meet him at the Speedway Gas Station at 79th Street and Harlem Avenue in Chicago. The CI agreed. Law enforcement officers established surveillance at that location. BOJDA came to the meeting, accompanied by Wojtek. BOJDA led the CI to a vehicle parked on the 7900 block of South Oak Park Avenue, east of the gas station. The vehicle was a four-door 2004 BMW, bearing license plates G123292 registered to the CW. BOJDA handed the keys to this BMW to the CI so that the CI could have the vehicle shipped to Poland. BOJDA and Wojtek then departed, after which the CI turned over the keys to the surveillance officers. The CI later reported that BOJDA had called him and stated that on a later date he would give the

19

CI more vehicles to be shipped to Poland.

44.     On May 9, 2007, the CW reported that FLASZ had directed the CW to pick up a vehicle that was parked at the intersection of Bertuae and Moody in Chicago; to drive the vehicle to Canada; and then to fly to Poland, never to return to the United States.  A law enforcement officer then went to that location and secured the vehicle (a black Audi Q7 with plates registered to a W.K.).

45.     On May 11, 2007, the CI reported that BOJDA had given him the keys for a Mercedes Benz, which was parked in Summit, Illinois, for shipment to Poland.  A law enforcement officer picked up the keys from the CI and seized the vehicle, believed to be the same Mercedes roadster that FLASZ had previously driven (*see* paragraph 14(c) above).

46.     On May 24, 2007, the CI reported that BOJDA had contacted him about shipping two to three more cars to Poland.  The CI further stated that BOJDA indicated that FLASZ wanted to meet with him to discuss the shipments.

47.     On July 27, 2007, the CI reported that FLASZ intended to deliver some furniture and personal belongings that he (FLASZ) wanted shipped to Poland.  Law enforcement officers established surveillance at the location where FLASZ planned to meet with the CI, specifically, 1121 North Elise, Bensenville, Illinois, and observed FLASZ deliver a truckload of furniture and home electronics to the CI.

48.     On August 20, 21, and 24, 2007, the CI recorded telephone conversations with FLASZ, under the supervision of a law enforcement officer.  During those conversations, the CI and FLASZ discussed, among other things, FLASZ's need to

obtain counterfeit titles for the vehicles that the CI was supposed to ship to Poland.

49.    On September 5, 2007, the CI recorded a telephone conversation with BOJDA under the supervision of an officer.  During this conversation, BOJDA emphasized that he was working with FLASZ, not Wojtek.  BOJDA stated, "I work with Arthur, we are doing the cars."  BOJDA further stated, "I did not work with Wojtek.  I gave you the cars.  Not Wojtek and I.  These cars are mine and you know about this.  You know that these cars belong to me."  BOJDA cautioned the CI that if he took the cars, "we both will have a problem."

50.    On October 4, 2007, the CI recorded a telephone conversation with FLASZ, under the supervision of an officer.  After the conversation, the CI informed the officer as to what was said during the conversation.  According to the CI, he told FLASZ, among other things, that he (the CI) needed to get a hold of Wojtek because he (the CI) knew individuals with really good credit and that he wanted to arrange a deal with Wojtek.  FLASZ explained to the CI that he did not need Wojtek because he (FLASZ) could handle any such deals and make everyone a lot of money.  FLASZ further explained that they would work with Adam (BOJDA) and that he had not seen Wojtek in a long time.  During this conversation, the CI also asked FLASZ when he would be able to get titles for the cars that the CI was supposed to ship to Poland for FLASZ.  FLASZ told the CI that he was unable to get titles from his contacts in Poland, and he asked the CI if he (the CI) would be able to get titles from someone that the CI knew.  The CI told FLASZ that he knew someone who could get clean titles for $600.  FLASZ said that he would get back to the CI.

21

51.    On October 17, 2007, the CI recorded another telephone conversation with FLASZ under the supervision of a law enforcement officer. This conversation, like the others, was in Polish. According to the CI, he told FLASZ, among other things, that he knew people who were seeking fraudulent titles to transport and sell cars in Poland and that he wanted to know where he could send these people to get the titles. FLASZ responded that he could get fraudulent Pennsylvania and New Jersey titles for whoever might need them. FLASZ further stated that he had a person in Poland who could print fraudulent titles for whatever state they wanted, once the cars were in Poland. During this conversation, the CI also told FLASZ that he knew two individuals who had great credit and who wanted to work with FLASZ and BOJDA to make money. FLASZ told the CI that if they had great credit, he (FLASZ) would pay $20,000 to each person. When the CI asked FLASZ about getting paid for the costs of storing and shipping his vehicles to Poland, FLASZ responded that Adam (BOJDA) was currently working on a deal that would generate a lot of money and that they would then be able to pay the CI for everything. At the conclusion of the conversation, the CI told FLASZ that the two individuals with the good credit would be available to meet the following week. FLASZ agreed to meet with them, and added that he would arrange for Adam (BOJDA) to attend the meeting and to check their credit to make sure that they had good credit.

52.    On October 24, 2007, FLASZ called the CI. They agreed to meet the following day at the Blue Angel restaurant on Milwaukee and Central Avenue in Chicago.

53.    On October 25, 2007, law enforcement officers established surveillance at the prearranged meeting location. Two Secret Service agents accompanied the CI to the meeting, posing as the two individuals whom the CI had previously agreed to introduce to FLASZ. FLASZ was present for the meeting, but BOJDA was not. During the meeting, FLASZ provided the CI with two blank car titles, from different states. The CI introduced the two agents to FLASZ and discussed using their identities to apply for home and vehicles loans. FLASZ explained how they could set up fake corporations to borrow money. FLASZ stated that they would each be paid $20,000 in exchange for allowing their credit to be used.

## E.    *Vehicle and Property Records*

54.    During the investigation, the government obtained records of the purchases of some of the subject vehicles and property. For example:

(a)    Records provided by First Franklin Financial Corporation and Home Loan Services reflect that the CW purchased the Elm Street property on June 15, 2006 (*see* paragraph 14(b) above), for a price of approximately $650,000. The property was paid for with two mortgage loans from First Franklin Financial Corporation. One of the mortgage loans was in the amount of approximately $527,565 and the other loan was in the amount of approximately $129,162. The mortgage loan applications contained false information regarding the CW's employment and income, specifically, that the CW was the owner of "Perfect Construction Inc." with a gross monthly income of $14,600.

(b)    Records provided by JP Morgan Chase Bank show that on October

20, 2006, the CW purchased a 2007 Mercedes S550 from Luxury Motors O'Hare (*see* paragraph 14(c) above), which purchase was financed by a loan from Chase in the amount of approximately $93,455. The credit statement falsely listed the CW as the president of a construction company, "Surmacz Construction," with a monthly salary of $17,500 and a secondary income of $3,500 from "rental property."

(c)     Records provided by Fifth Third Bank show that on October 20, 2006, the CW traded in a Mercury Villager minivan toward the purchase of a 2003 Mercedes SL500R roadster from Luxury Motors O'Hare (*see* paragraph 14(c) above). The purchase was financed with a loan from Fifth Third Bank in the amount of approximately $73,616. The credit statement falsely represented that the CW was the president of "Surmacz Construction" with a monthly salary of $17,500 and a secondary income of $3,500 from "rental property."

(d)     Records provided by Chicago Harley Davidson show that a 2007 Harley Davidson motorcycle was purchased on February 10, 2007, by M.G.  The purchase was financed with a loan from Eaglemark Savings Bank in the amount of approximately $18,428.  The loan application stated that M.G. was employed as a project manager for "Artizan Designs," earning $19,000 in gross monthly income. An agent has visited the address listed on the loan application as the address for Artizan Designs and discovered that that location is a residential condominium building. Building management informed the agent that there were no businesses in the building, including Artizan Designs. The home telephone number listed on M.G.'s loan application, (773) 727-7090, is the same telephone number that was listed in the

newspaper ad to which the CW had responded before getting involved in the scheme (see paragraph 14(a) above). According to Harley Davidson Credit, no payments were made on this loan. The motorcycle was later located and seized when the search warrant was executed at FLASZ's residence (see paragraph 34 above).

(e)   Records provided by Lakeshore Harley Davidson in Libertyville show that a 2007 Harley Davidson motorcycle was purchased on February 13, 2007, by M.G. The purchase was financed with a loan from Eaglemark Savings Bank in the amount of approximately $27,000. The loan application contained the same apparently false information regarding M.G.'s employment as the loan application referenced above. And just as no loan payments were made on the loan referenced above, no payments were made on this loan either. This motorcycle was also located and seized at FLASZ's residence (see paragraph 34 above). On May 1, 2007, a law enforcement officer interviewed the salesman at Lakeshore Harley Davidson. The officer displayed photo spreads to the salesman, containing photos of FLASZ and M.G. The salesman immediately recognized FLASZ as the primary person with whom he dealt in connection with the sale of the motorcycle. The salesman said that the photo of M.G. looked familiar, but that he thought a different person, looking similar to M.G., actually made the purchase.

(f)   Records provided by Delaware Place Bank show that a 2004 BMW M3 coupe was purchased by M.G. on January 13, 2007, at Luxury Motors O'Hare. The purchase was financed with a loan from Delaware Place Bank in the amount of approximately $44,979. The loan application stated that M.G. was employed as a

25

project manager for Artizan Designs, similar to the loan applications for the Harley Davidson motorcycles referenced above, though this loan application listed a slightly higher monthly income of $19,600. Although no payments were made on the Harley Davidson loans, Delaware Place Bank reported that one payment had been made on this BMW loan. Delaware Place Bank was able to produce photographs from bank surveillance cameras showing the person who made that payment. I have examined the bank surveillance photos and person shown in the photos appears to be BOJDA. As stated in paragraph 28, above, the vehicle was repossessed at the Elm Street property, with the assistance of the Cook County Sheriff's Department.

(g)    Records provided by Laurel Audi in Westmont show that on March 31, 2007, an individual named W.J. purchased an Audi Q7. The vehicle was purchased with a down payment in the amount of approximately $5,500 and a loan from Wells Fargo Auto Finance in the amount of approximately $51,608. W.J.'s consumer credit application stated that W.J. was employed as a crew manager for "EZ Construction," purportedly located at 1801 Elm Street, Park Ridge, Illinois (the Elm Street property). On April 30, 2007, an agent interviewed the dealership's general manager, who indicated that the lender disapproved the loan upon learning that W.J.'s driver's license had been suspended. The dealership then tried to contact W.J. to repossess the vehicle, but the background information provided to the dealership turned out to be false. As indicated in paragraph 26 above, the dealership sent a repossession specialist to the Elm Street property to look for the vehicle, without success. On April 30, 2007, an agent also interviewed two salesmen at the dealership who had dealt with W.J.

They stated that W.J. spoke very little English and had a companion who did most of the talking. The agent showed them a photo spread containing a photo of BOJDA, and they identified BOJDA as the companion who did most of the talking.

(h)    Records provided by Perillo BMW show that on October 21, 2006, the CW purchased a 2006 BMW 750Li from Perillo BMW (*see* paragraph 14(d) above), which purchase was financed with a loan from BMW Bank of North America in the amount of approximately $73,086. The consumer credit application falsely listed the CW as the president of "Surmacz Construction" with an annual gross income of $196,000 and "other annual income" of $48,000. Perillo BMW's records further show that a 2003 BMW 325i was also purchased at Perillo BMW on October 21, 2006 (believed to be the vehicle that was purchased by the female (K.B.) who was with the CW and FLASZ at the dealership (*see* paragraph 14(d) above)). The vehicle was not purchased in the name of K.B., but in the name of "Katarzyna M. Banas." BMW's collection department has reported that the loan issued to "Banas" to purchase the vehicle went into default after the first payment was due and that BMW was trying to locate and repossess the vehicle.

55.    On October 11, 2007, I interviewed K.B., who confirmed that she signed the papers for the purchase of the BMW 325i at Perillo BMW on October 21, 2006. K.B. stated that she went to the dealership as a favor for a friend. More specifically, K.B. stated that her friend asked her to take her (the friend's) driver's license and accompany a man named "Artur" (FLASZ) to the dealership because her friend had to work and could not go. I showed K.B. a photograph of FLASZ and she identified him

27

as the person whom she accompanied to the dealership. K.B. further stated that this individual, FLASZ, did all of the talking at the dealership and told her what to do and what papers to sign. She further stated that she presented her friend's driver's license at the dealership. I have examined a copy of the driver's license that was maintained in the files of Perillo BMW, and observed that the photograph and physical description of the person on the driver's license, "Katarzyna M. Banas," does not match K.B. During my interview of K.B., I also showed her a photograph of BOJDA, and she identified BOJDA as a person who arrived at the dealership at the conclusion of transaction, but had no contact with her. K.B. further stated that after the conclusion of the vehicle transaction, FLASZ drove her back to her friend's home. When K.B. arrived, she discovered that her friend had left for Poland instead of going to work.

## IV. The Charged Offense

56. The criminal complaint charges FLASZ and BOJDA with bank fraud in violation of Title 18, United States Code, Section 1344.

57. The Federal Deposit Insurance Corporation ("FDIC") maintains a financial institution directory on its Internet website, which provides public information regarding the insured status of financial institutions. According to the information available on that website, a number of the lenders who were induced to issue loans to straw buyers in this case are insured by the FDIC, including BMW Bank of North America, which financed the CW's purchase of a 2006 BMW 750Li (*see* paragraph 54(h) above); Delaware Place Bank, which financed M.G.'s purchase of a 2004 BMW M3 (*see* paragraph 54(f) above); Eaglemark Savings Bank, which financed

M.G.'s purchase of two 2007 Harley Davidson motorcycles (*see* paragraphs 54(d) and 54(e) above); Fifth Third Bank, which financed the CW's purchase of a 2003 Mercedes Benz (*see* paragraph 54(c) above); and JP Morgan Chase Bank, which financed the CW's purchase of a 2007 Mercedes Benz S550 (*see* paragraph 54(b) above). The loans on all of those vehicles have gone into default.

## V. Conclusion

58.    Based on the facts set forth above, there is probable cause to believe that FLASZ and BOJDA participated in a scheme to defraud various FDIC-insured financial institutions and knowingly executed and attempted to execute that scheme through a variety of means, including the fraudulent purchase of vehicles.


THOMAS TILTON
Special Agent
United States Secret Service


Subscribed and sworn to before me
this 25th day of October, 2007.


ARLANDER KEYS
United States Magistrate Judge


29